State v. Miles.

*Brown, P. J.,* and *Walker, J.,* concur.

---

THE STATE v. JAMES R. MILES, Appellant.

Division Two, December 9, 1913.

1. **APPEAL: Preserving Exceptions: Motion for Continuance Overruled.** The trial court's action in overruling appellant's application for a continuance is not for review on appeal when there is no showing in the bill of exceptions that an exception was saved to the ruling.

2. **WITNESS'S REPUTATION: Collateral Issue: Discretion of Trial Court.** Six witnesses testified for defendant that the general reputation of a State's witness for truth and veracity was bad. For the State in rebuttal three witnesses testified that the general reputation of the witness in that regard was good. When, thereafter, defendant offered three additional witnesses to testify further concerning the general reputation of the witness, the trial court refused to admit their testimony. *Held,* not error. The general reputation of the witness was a collateral issue, and the trial court is allowed a rather wide discretion in limiting the number of witnesses that may testify on such issues.

3. **SELF-DEFENSE: Instructions: Reasonable Ground for Belief.** In a prosecution for murder an instruction was, under the evidence of the case, rightly refused which in part declared that when a person has reasonable ground to apprehend that some one is about to do him great bodily harm, etc., "he may act upon appearances," etc. An instruction given by the

State v. Miles.

court fully covered the law of self-defense, and as to the above point told the jury that it was not necessary that the danger should have been actual, etc., but that the defendant must have believed and also had reasonable cause to believe that deceased was about to take his life or do him some great bodily harm; and that, in determining whether defendant had reasonable cause to so believe, they should take into consideration "all the facts and circumstances given in the case."

4. ———: ———: **Continuing to Shoot: Evidence.** Where there is no evidence tending to show that deceased was advancing toward defendant after the first shot was fired, defendant is not entitled to an 'instruction that if he "shot to prevent the deceased from killing him or doing him some great bodily harm then defendant had a right to shoot *and keep shooting* until such danger, or apparent danger, had passed."

5. **HOMICIDE: Instructions: Presumption of Innocence: Point Already Covered.** Defendant cannot complain of the refusal of an instruction as to the presumption of his innocence, when that matter was fully and fairly covered by an instruction given for the State.

6. ———: ———: **As to Bad Man or Good.** In a prosecution for murder where there is evidence that deceased was a bad man, it is not improper to instruct that "in law it is the same offense to kill a bad man as it is to kill a good man," etc.

Appeal from Christian Circuit Court.—*Hon. John T. Moore,* Judge.

AFFIRMED.

*G. A. Watson, G. W. Thornberry, G. Purd Hays* and *Robert Derryberry* for appellant.

It was an abuse of the court's discretion in refusing defendant's application for a continuance. Distilling Co. v. Van Frank, 88 Mo. App. 50; State v. Tettation, 150 Mo. 354; State v. Hesterly, 182 Mo. 16; State v. Warden, 94 Mo. 648; State v. Anderson, 96 Mo. 250; State v. Maddox, 117 Mo. 667; State v. Tatlow, 136 Mo. 682. As to the court's discretion in limiting the number of witnesses, see St. Louis M. & Ser. Co. v. Aubuchon, 199 Mo. 352.

*John T. Barker*, Attorney-General, and *Thomas J. Higgs*, Assistant Attorney-General, for the State.

The trial court did not abuse its discretion in limiting the number of the character witnesses. Furthermore, witnesses had been introduced by the defendant as to the bad reputation of the State's witness, Henry Lewallen, and in its rebuttal the State had put on witnesses as to his good reputation. The defendant now having put the matter in issue attempts to come back in his rebuttal and introduce three more witnesses as to the reputation of Lewallen. This was not proper rebuttal testimony and the irregularity of the introduction of testimony was a matter for the trial court and within its discretion. State v. Bailey, 190 Mo. 329; State v. Dilts, 191 Mo. 673.

WILLIAMS, C.—Upon an information charging murder in the first degree, defendant was tried in the circuit court of Christian county, Missouri,

**Murder.** resulting in his being convicted of murder in the second degree and his punishment being assessed at ten years in the penitentiary. The case originated in Taney county, Missouri; but was removed by change of venue to the circuit court of Christian county, Missouri. Defendant by proper steps appeals from the judgment of said circuit court.

The State's evidence tends to prove the following facts: Defendant shot and killed one Enos Rush, at about five o'clock p. m., January 4, 1912, at Branson, Taney county, Missouri, where both the defendant and the deceased lived. The shooting occurred in the grocery store and meat market of M. L. Heflin. Up until about a week prior to the shooting, Rush, the deceased, had been working for said Heflin in the meat market; but had been drinking for about a week and had quit the employment. About an hour before the shooting, deceased went into Heflin's store and again

applied for his old position and upon promising to cease his drinking was again employed, his work to begin on the following morning. About five p. m., defendant came to the door of Heflin's grocery store and called to Rush, saying: "I want to speak to you." Thereupon deceased went out of the store; and in about ten or fifteen minutes deceased and defendant came back into the store. Deceased went behind the counter on the south side of the store and up to a drawer, behind the counter, where envelopes, stationery and waybills were kept. He pulled out the drawer and closed it again and walked back, in the direction that he had entered, to an opening between the ends of the two counters. Deceased had his hands in his pockets and leaned back against the shelving on the side of the store. Defendant then spoke to deceased about some money, which he claimed the deceased owed him, and deceased replied that he would never pay it. At this point Mr. Heflin asked defendant to leave and not cause any trouble; and deceased raised one of his hands, motioning toward defendant, saying: "Go on off, we don't want no trouble in here. I will never pay it." Thereupon defendant drew his revolver and deceased said: "You can't bluff me," or "You can't scare me. I am not afraid of you or afraid of your gun. You can't bluff me." Defendant said "I can't, ha," and thereupon shot the deceased three times, one shot entering the body a short distance above the heart, another shot a short distance below the heart; and then the defendant, taking one step toward the door, shot a third time, this last shot striking the deceased in the arm. Deceased died in about fifteen minutes, as a result of the bullet wounds. Defendant was about five feet from the deceased at the time of shooting. Mr. Heflin and his wife and a Mr. Carey were eyewitnesses to the shooting. Mr. Heflin further testified that he was about two and one-half feet from deceased and about six feet from defendant, at the

time of the shooting, and that deceased made no attempt to use any weapon at the time he was shot and that deceased was unarmed at that time; that deceased wore an overcoat and had one hand in his overcoat pocket and was leaning back against the shelving at the time he was shot; that a person in front of the counter could not see the drawer which deceased had manipulated just before the shooting; that there was no gun in the drawer at the time. About two days before the shooting, Mr. Heflin had taken a revolver, which was used about the meat market for the purpose of killing cattle, and hidden the same in a sack of nuts, about five feet from the place where deceased was shot; that a few . days before the deceased had taken the revolver from the place where it was formerly kept, and was in the act of going across the street, to get some cartridges, when he was arrested for disturbing the peace; and, on the day of the shooting, deceased pleaded guilty, in the justice court, to the above charge and paid a fine, part of which fine Mr. Heflin had paid. Heflin testified that he hid the gun in the sack of nuts so that deceased could not get it and Heflin be called upon to help pay another fine. The pistol was found in the sack of nuts after the shooting. Mrs. Heflin testified that after deceased opened the drawer and came back to the opening between the counters, deceased and defendant began quarreling about some money that one owed the other, and that the deceased, in a loud tone, said to the defendant: "You get out of here, sir." That thereupon defendant drew his pistol and deceased said: "I am not afraid of you; I am not afraid of your gun;" and thereupon defendant shot deceased and she became frightened and ran out the back door of the store, and did not see what occurred after the first shot. J. W. Bennett testified that he was in Heflin's store about forty minutes before the shooting, and heard a conversation between the defendant and Andy Eversole, in which Eversole

told defendant that deceased was going to have defendant "pulled for bootlegging whiskey" and that defendant started out the door and said: "I will whip that s— of a b— for that." John Humphries, a grocery man, testified that about a week before the killing defendant told him he would "whip the s— of a b— when his hand got well," because Rush had had him indicted for selling whiskey. George Berry testified that about thirty minutes before the shooting defendant, with a pistol in his hand, was in a near-by barber shop and said that if Rush fooled with him he would whip him when his hand got well, if not before. O. T. Thurman testified that, a short time before the killing, defendant came into the barber shop, took a pistol out of a drawer and put it in his belt and left the barber shop; that, later, he saw defendant call deceased out of Heflin's store and saw deceased and defendant go out of the store and in a few minutes return to the store and a short time thereafter he heard a shot and turned and walked up close to the store and saw defendant fire the last two shots. William Stark testified that defendant said, on the afternoon of the shooting, "I will whip him (Rush) before the sun goes down." Henry Lewallen testified that about an hour before the shooting, defendant, in referring to the deceased, said he was "going to shoot that s— of a b— so high before the sun goes down that he will never come down, and you see if I don't." E. S. Pelton testified that defendant, as he came out of Heflin's store just after the shooting, said, "He can't run no bluff on me."

Defendant testified, in his own behalf, as follows:

"On the 4th day of January, 1912, about five o'clock in the evening, or half past five, I started to go home for supper and I was going by Major Heflin's after some butter and going by Mr. Patterson's

to pay some of what I owed and when I got down to Mr. Troutman's store Mr. Rush was standing talking to somebody on the porch, and I says: 'Mr. Rush, I want to see you when you get through,' and stopped between the two buildings, and he says: 'All right,' and they talked a second or two and Mr. Rush came where I was, and this fellow walked down the street and I says: 'How did you come out with the trial?' and he says: 'I plead guilty and it cost me twenty-seven dollars, and I says, 'Mr. Rush, I owe Mr. Patterson a little bill and they are wanting their money and I would like for you to pay me,' and he says: 'Yes, come into Major Heflin's and I will pay you,' and we went down and went in and he went behind the counter, and I thought was pulling out the drawer to get the money, and he put this hand upon the show case, and put this hand (indicating to right hand) on the drawer and pulled it out, and he put his hand this way in his pocket and turned round and says, 'See that door,' and I says, 'Yes, sir,' and he says, 'Get out,' and I says, 'What do you mean, you said you would pay me that $1.15 if I would come in here, now why don't you?' and he says: 'I pay you nothing, you get out,' and he started to draw his gun and I says: 'Don't do that, Rush, don't do that,' and drew my gun, and when he saw my gun he says: 'You can't bluff me, you can't scare me,' and I says: 'I know I can't, but don't pull your gun on me,' and then he stepped a step or two and started to pull his gun and I fired twice and then I stepped east one step and fired once more and walked out.''

Defendant further testified that he at no time made any threats to kill deceased; that he knew the deceased had made an attempt to file complaint against him for selling whiskey; that he fired the first shots while holding the revolver down at his side and that

he shot because he thought the deceased was going to kill him. Defendant testified that he had heard of deceased's threats against him but paid no attention to them, and thought deceased was too good a friend to make an attempt to carry out the threats. Other testimony, in behalf of the defendant, was, in substance, as follows: Wash Carey testified that he was in Heflin's store at the time of the shooting and, after the deceased had gone to the drawer and back to the opening between the two counters, defendant demanded an amount of money from the deceased; the deceased braced himself up in front of the defendant and told defendant that he wasn't afraid of him and that he didn't have him bluffed; that he did not see the deceased making any motion with the hand that he had in his pocket but saw the deceased motioning defendant out of the store with the other hand, and at about this time defendant drew his gun, and defendant said, "Don't do that, don't do that, Rush," (Mr. Heflin and wife testified that they did not hear deceased make the statement), and immediately afterwards fired the first shot at the deceased. Witness did not see the other shots, on account of being occupied in helping Mrs. Heflin out of the store. Ben Carson testified that, about a week before the killing, he saw Rush in Heflin's meat market and Rush said that he did not think defendant was a law-abiding citizen and he did not want that kind of a man to undertake to arrest him and that if he did undertake it, "one or the other would get his lights put out;" and that deceased pulled a revolver out of a drawer behind the counter and said: "That is my old stand-by;" and made motions with his hands and arms and stated that Miles "Couldn't face him with them things" and that "he was a little bit handy with his fists." Andy Eversole testified that, on the day of the killing, he had a talk with the deceased on Heflin's porch, and, in discussing the fine

which the deceased had just paid, witness said to deceased: "This will be a little hard on the whisky men's business," and deceased replied, "You are d— right, it is a starter." At about that time defendant passed and deceased said: "We will get that s— of a b— before night." About an hour before the shooting witness told defendant what deceased had said. Robert Maddox testified that, about an hour before the shooting occurred, he heard deceased say, concerning the defendant: "I am going to kill that s— of a b— before night;" fifteen minutes later witness told defendant what Rush had said. Elizabeth Schneller testified that, several days before the killing, she was in Branson and passed Rush and his wife on the street and heard Rush say: "I am going to kill every d— man in Branson; that d— s— of a b— of Jim Miles the first one; if I had got the cartridges I would have killed him this evening." Six witnesses testified that the general reputation of witness Henry Lewallen for truth and veracity, in the community in which he lived, was bad; three witnesses testified that the reputation of the deceased for being overbearing, quarrelsome and dangerous was bad; one of said witnesses saying that deceased was all right when he was sober. Cecil Snapp, the son of the justice of the peace before whom deceased pleaded guilty for peace disturbance on the morning of the day of the killing, testified that he was in his father's office when deceased was settling the disturbance case and that deceased was drunk that day and had a revolver or something that looked like a revolver in his hip pocket; that it might have been a whisky bottle, and that deceased threatened to kill the defendant and that witness communicated that fact to defendant and told him to be on his guard.

The State offered the following testimony in rebuttal: Mary Breeden testified that she saw the defendant and deceased come out of Heflin's store about

ten or fifteen minutes before the shooting occurred. Mrs. Rush, wife of deceased, testified that she had never heard her husband make any threats against the defendant and that they were friends, as far as she knew. She denied that she and deceased passed Mrs. Schneller in front of the post office, and denied that her husband made the threat mentioned by Mrs. Schneller. G. B. Wilson, prosecuting attorney, testified that he was in the justice's office when the deceased was settling up the disturbance case, on the day of the killing, and that Rush made no threats there against the defendant and that Rush was drinking some and was "in good fighting trim" when the witness left Branson, on the afternoon of the shooting. The State then introduced three witnesses testifying to the good reputation for truth and veracity of witness Henry Lewallen. The defendant then offered three other witnesses to testify to the bad reputation of the witness Henry Lewallen; but they were not permitted to testify, by the circuit court, on the ground that six witnesses had already been sworn and testified on that point in behalf of the defendant.

## OPINION.

I. Appellant contends that the circuit court erred in overruling his application for a continuance. The motion for a continuance, together with a recital that the court overruled the same, is properly set forth in the bill of exceptions; but nowhere in the bill of exceptions does it appear that an exception was saved to the action of the court thereon. The point is therefore not properly raised for appellate review. [State v. Prather, 136 Mo. 20, and cases therein cited.]

**Motion for Continuance Overruled: Preserving Exceptions: Appeal.**

II.   Witness Lewallen testified for the State as to threats made by defendant upon the life of deceased.   Defendant produced six witnesses who testified that the general reputation of the witness for truth and veracity was bad; three of said witnesses testified about his general reputation at Branson and three about his general reputation while he resided at Springfield.   Later the State, in rebuttal, used three witnesses who testified that the general reputation of Lewallen, in that regard, was good.   The defendant, thereafter, offered three additional witnesses to testify further concerning the general reputation of said witness and the trial court refused to allow the three additional witnesses to testify, assigning as reason therefor that defendant had used six witnesses for that purpose.   Appellant contends that this constituted error.   The general reputation of the witness, Lewallen, was a collateral issue in the case.   The trial court is, and should be, allowed a rather wide discretion in limiting the number of witnesses that may testify on such issues.   [Railroad v. Aubuchon, 199 Mo. 352, l. c. 360; State v. Lamb, 141 Mo. 298.]   It is not apparent that the trial court abused its discretion, in that regard, and the point is ruled against appellant.

*Reputation of Witness: Court's Discretion to Limit Number of Witnesses.*

III.   Appellant next contends that the court erred in refusing to give his instruction A, which in part declared that when a person has reasonable ground to apprehend that some one is about to do him great bodily harm, etc., "he may act upon appearances," etc.   Instruction 13, given by the court, fully covered the law of self-defense and, as to the above point, told the jury that it was not necessary that the danger should have been actual, etc., but that the defendant must have believed and also had reasonable cause to believe that said Rush was

*Instructions.*

about to take his life or do him some great bodily harm; and that, in determining whether defendant had reasonable cause to so believe, they should take in consideration "all the facts and circumstances given in the case." This sufficiently declared the law of self-defense, on that point, under the evidence of the case.

Appellant's refused instruction D declared that if "defendant shot to prevent the deceased from killing him or doing him some great bodily harm then defendant had a right to shoot *and keep shooting* until such danger, or apparent danger, had passed, or ceased." Appellant insists that deceased was on his feet and advancing toward defendant when the last shot was fired, and that this instruction should have been given. A careful examination of the evidence, however, fails to disclose any evidence tending to show that deceased was advancing toward defendant, after the first shot and before the last shot was fired, and there was, therefore, no evidence upon which to base such an instruction.

Appellant's refused instruction B declared the law with reference to the presumption of defendant's innocence; but that matter was fully and fairly covered by instruction 3, given on behalf of the State.

Appellant next contends that instruction 6, given by the court, was erroneous. Said instruction is as follows:

"The jury are instructed that in law it is the same offense to kill a bad man as it is to kill a good man, and although the jury may believe from the evidence that deceased, when intoxicated, was a bad or quarrelsome man, this fact alone will not justify or excuse the defendant for the killing of the deceased."

While it was not necessary that the above instruction should have been given, yet it contains a correct declaration of law and, under the evidence in the case, was not improper. The identical instruction was ap-

proved by this court in State v. Hardy, 95 Mo. 455, 1. c. 457.

We have carefully examined the entire record of the case. The evidence was amply sufficient to support and justify the verdict of the jury; the instructions fully and fairly declared the law applicable to. the facts in the case, and it appears that the defendant has had the privilege of a fair and impartial trial.

The judgment is affirmed. *Roy, C.,* concurs.

PER CURIAM.—The above opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges- concur.