THE STATE v. WILLIAM L. ROBERTS, Appellant.

In Banc, January 26, 1920.

1. **EVIDENCE: Exclusion of Proffered Testimony: Preserved for Review.** A complaint that the trial court erred in excluding evidence of specific turbulent prior acts of deceased known to appellant, cannot be reviewed on appeal unless appellant offered to prove what the prior acts were.

2. **SELF-DEFENSE: Perfect and Imperfect: Instruction.** Defendant went to deceased's feed lot in response to a request by deceased that he keep his turkeys on his own premises. In the quarrel which en-

sued, each called the other a liar, and deceased threw a neck-yoke at defendant, who hurriedly went away in the direction of his residence, one-eight of a mile distant, saying he would return in a few minutes. He returned in a few minutes with a double-barrelled shot-gun, and as deceased was approaching him and was in the act of climbing over a fence, with an ax in his hand, and was yet seventy-five feet distant, defendant fired both barrels of the gun in rapid succession. In explanation of his return to the feed lot defendant testified: "I went down there to see if I could settle the difficulty without any further trouble, because I wanted to settle it while it was new. He and I had been good friends, and I thought probably I could do it that way, and I took the gun along with me to defend myself if I couldn't." *Held*, first, that upon this explanation defendant was entitled to have the court instruct on the imperfect right of self-defense, and the instruction denying him that right was error; and, *second*, that the evidence would not justify an instruction on the perfect right of self-defense, and the portion of the instruction which deals with that subject was more favorable to defendant than the evidence warranted.

3.    ———: ———: Return to Scene of Difficulty: Guide. If the testimony clearly shows that defendant returned to the scene of the former difficulty in a threatening, bluffing or menacing manner, armed with a shotgun, and by such means intentionally provoked or brought about a renewal of the difficulty, with the felonious intention of causing deceased to renew the attack so that he might have a pretext for killing him or doing him great bodily harm, he is not entitled to invoke any phase of the right of self-defense, even though, after he had renewed the quarrel, deceased started towards him with an ax in hand, and defendant shot him while he was yet seventy-five feet away. If, however, defendant wrongfully sought a renewal of the quarrel with the intention of merely overawing the deceased, or of holding him in check while a discussion could be had and a settlement or a mutual understanding reached, or to accomplish any result other than the death or great bodily harm of the deceased, he is entitled to invoke the imperfect right of self-defense, which would reduce the homicide to manslaughter in the fourth degree.

4.    ———: Apprehended Danger: Unnecessary Force. The sentence "nor is any one justified in using any more force than is necessary to get rid of his assailant" has no proper place in an instruction on self-defense.

5.    ———: Voluntarily Engaging in Difficulty. An instruction on self-defense which tells the jury that if they believe from the evidence that defendant "voluntarily and of his own free will engaged" in the difficulty, is erroneous. Such a clause unmodified has no place in an instruction dealing with the subject of self-defense.

Appeal from Boone Circuit Court.—*Hon. David H. Harris,* Judge.

REVERSED AND REMANDED.

*Bruton & Hulett, Frank G. Harris* and *M. R. Conley* for appellant.

(1) The court erred in giving Instruction 12 for the reason that it erroneously set forth the law as applied to the facts in this case in the following particulars: (a) Said instruction thus stated the law of th *quantum* of force and resistance defendant was justified in using. This proposition is stated in the instruction in the language: "Nor is any one justified in using any more force than is necessary to get rid of his assailant." This statement of the law without qualification has been condemned by this court. State v. Hollingsworth, 156 Mo. 186; State v. Harper, 149 Mo. 527; State v. Rose, 142 Mo. 428; State v. Palmer, 188 Mo. 568. (b) Said instruction also erroneously stated the following propositions of law: "But on the other hand the law does not permit a person to voluntarily seek or invite a combat or put himself in the way of being assaulted in order that when hard pressed he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right of attack and it will not follow in any case where the difficulty is sought for and induced by the party by any willful act of his, or where he voluntarily and of his own free will enters into it. . . . So if you believe from the evidence in this case that the defendant Roberts voluntarily sought or invited the difficulty in which Ryland lost his life, or that he, defendant, provoked or commenced or brought it on by any wilful act of his own, or that he voluntarily and of his own free will engaged in it, then in that case you are not authorized to acquit him on the ground of self-defense." This instruction was erroneous for the reason that it omitted to state the intent with which the defendant must have voluntarily entered into or

put himself in the way of a difficulty, which must be for the purpose of committing a violent act, and has been condemned in the following cases: State v. Gilmore, 95 Mo. 554; State v. Stilts, 97 Mo. 120; State v. Cable, 117 Mo. 380; State v. Gamble, 119 Mo. 427; State v. Sharp, 233 Mo. 269, 292. (2) The court erred in refusing defendant's Instruction D. This instruction was framed to present defendant's theory of self-defense and the issues of law involved in it necessary to be applied to the facts in the case. The following portions of it are particularly relevant and pertinent and were not embodied in any other instructions in the case: ''In this connection you are further instructed that the law did not require the defendant to retreat or to wait until said Ryland actually attacked him but that he could use any means for his own protection that appeared reasonably necessary under the circumstances.'' See authorities, supra.

*Frank W. McAllister*, Attorney-General, *C. P. Le Mire*, Assistant Attorney-General, for respondent; *Don C. Carter* of counsel.

(1) Under the facts in this case, it was unnecessary for the court to instruct on any phase of the law of self defense. Wharton on Homicide (3 Ed.), secs. 319-328; Bush v. State, 40 Texas Crim. 539; Henry v. People, 198 Ill. 162; State v. Evans, 124 Mo. 410; State v. Evans, 128 Mo. 412; State v. Hudpseth, 150 Mo. 32; State v. Patterson, 159 Mo. 561; State v. Feely, 194 Mo. 322; State v. Eastham, 240 Mo. 249; State v. Larkin, 250 Mo. 245; State v. Miles, 253 Mo. 438. Where the statements of the defendant are contradicted by all the other evidence, and the physical facts, and are unreasonable and inconsistent with the experience of mankind, the court is not bound to instruct the jury in regard thereto. State v. Tucker, 232 Mo. 18; State v. Arnold, 206 Mo. 600; State v. King, 203 Mo. 571; State v. Vaughan, 200 Mo. 22; State v. Fraga, 199 Mo. 136; State v. Hamilton, 170 Mo. 377; State v. Hol-

loway, 161 Mo. 144; State v. Hancock, 148 Mo. 488.
(2) Under the evidence in this case Instruction 12 was
sufficient, and furnishes no basis for reversible error.
State v. Eastham, 240 Mo. 249; State v. Feely, 194
Mo. 322; State v. Patterson, 159 Mo. 561; State v.
Partlow, 90 Mo. 608; State v. Darling, 202 Mo. 172;
State v. Gilmore, 95 Mo. 554.

WILLIAMS, J.—Upon an information charging
him with the crime of murder in the first degree, de-
fendant was tried in the Circuit Court of Boone County,
found guilty of murder in the second degree and his
punishment fixed at twenty years' imprisonment. De-
fendant has duly perfected an appeal.

The evidence may be summarized as follows:

William L. Roberts (hereinafter referred to as
appellant), about eight o'clock a. m., July 30, 1917,
killed, by firing in rapid succession both barrels of a
double-barreled shotgun, one William A. Ryland (here-
inafter referred to as deceased).

Appellant and deceased for many years prior to and
up to the time of the tragedy lived on adjoining farms
as friendly neighbors. Early on the morning of the
homicide the deceased and one Charles Palmer, a colored
farm-hand, went down to a feed lot on deceased's farm
for the purpose of feeding hogs and unloading some
shelled corn. The feed lot was about one-half mile from
deceased's farm house, and approximately one-eighth
mile from defendant's farm house. While deceased and
his helper were unloading the shelled corn some of ap-
pellant's turkeys came over near the feed lot. At about
the same time some of appellant's boys were seen by
the deceased. The deceased thereupon told his helper
to go over and tell appellant's boys to tell appellant
that he (deceased) desired that the turkeys be kept out
of the hog lot until he had finished fattening the hogs.
The colored farm-hand did as he was instructed, and
the appellant's boys delivered the message to the ap-
pellant. In a few minutes appellant went down to the

43—280 Mo.

hog lot. After some discussion concerning the turkeys, each called the other a liar, and deceased threw a neck-yoke at appellant. Appellant hurriedly went away in the direction of his home, saying he would return shortly. He kept his promise, and in a few minutes returned with a double-barreled shotgun, and after more discussion and while deceased was in the act of climbing the wire fence, with an ax in his hand, appellant fired in rapid succession both barrels of the shotgun, inflicting the wounds from which the deceased shortly thereafter died.

The appellant and the colored farm-hand are the only living witnesses to the tragedy. The farm hand testified for the State, and the appellant testified in his own behalf. There is some conflict in their testimony. The farm hand, testifying for the State, related the occurrence as follows:

"Well, he [appellant] came down and he says, 'What kind of word is that?' and he said to me, 'I don't want you to be chumping my turkeys' and I said, 'Mr. Roberts, I would not hurt your turkeys, I just merely throwed a little stick along behind them to hurry them along,' and Mr. Ryland said, 'I don't think he has been chumping your turkeys,' and he [appellant] said, 'You are a liar.' . . . Mr. Ryland just reached down and picked up a neck-yoke and threw it at Mr. Roberts, and Mr. Roberts broke and run away from the fence then, and he [appellant] says, 'I will be back in a few minutes.' " Appellant went away in the direction of his house and in a short time was seen returning. The deceased said to the witness, "Yonder comes Mr. Roberts back." The witness raised up and saw that appellant had a gun and the witness said to deceased, "What in the world is he going to do?" and deceased said, "I guess he is going to mean business." That appellant came up within about twenty-five steps of deceased and stopped between two trees and addressing deceased said, "Now, you son-of-a-bitch, if you want to get a neck-yoke, get a neck-yoke, and I will show you that I am game." Thereupon "Mr. Ryland picked

up an old ax and walked up kind of to the fence and said, 'You're on my premises,' and he [deceased] kind of raised his foot up like he was going to step up on the wire [fence], and Mr. Roberts said, 'I mean business,' and then, "Boom! Boom!" The deceased fatally wounded turned and walked a few feet and sat down on a plank. The appellant broke his gun for the purpose of removing the shells and walked back towards his home.

Appellant, testifying in his own behalf, stated that he and deceased had been good friends for many years prior to this trouble and that two or three times prior thereto the colored farm-hand told appellant's children to keep the turkeys away, and that the children did their best to do so. The day before the tragedy appellant's daughter told him that she had seen the colored man clubbing the turkeys, "trying to kill them." Early on the morning of the tragedy, appellant's boys came to him and told him that the colored man had just told them that deceased "did not want to catch them [the turkeys] on his side of the fence any more." Appellant told his boys that he would go down and see the deceased and that he didn't believe the word the colored man had sent, because the deceased had told appellant a few days before that "the turkeys weren't bothering to amount to anything and that he wasn't kicking." Appellant then went down to where the deceased and the colored man were at work, and after exchanging friendly greetings they talked several minutes about the crops and the weather and the scarcity of water. Appellant then related what occurred as follows:

"Well, I said, 'What about these turkeys, are they bothering you?' and he said, 'Well, some, but not a great deal,' and I said, 'Well, I didn't know, I have been away from home and the boys have been getting some word, or I got some word, and I thought I had better come and see you,—maybe they had been bothering,' and he said, 'Well, I haven't sent no word or authorized anyone to give you any word' and I said,

'Well, I will tell you what you had better do—you had better stop Charlie from meddling with your business then.' He said, 'Charlie has not been meddling with my business,' and I said 'Yes, he has,' and he said, 'You are a liar,' and I said, 'Well, he just sent me word down there this morning that you said not to let the turkeys get over the fence,' and he said, 'He never did no such a damned thing,' and I said, 'Well, I know he did,' and I said, 'Mr. Ryland, he was clubbing them turkeys and I don't think you ought to let him club them, and the boys are working hard to keep them out and they have been working hard and it is so close,' and he said, 'He has not been clubbing your God-damned turkeys,' and I said, 'Mr. Ryland, my daughter saw Charlie clubbing those turkeys along about nine o'clock in the morning,' and he said, 'That is a God-damned lie.' I said, 'Well, you are a damned liar, yourself,' and I said, 'I know she ain't,' and he said, 'I will kill you, you God-damned son-of-a-bitch,' and there was a neck-yoke lying there at his feet, and he was a very quick man, and he reached for that neck-yoke, and of course I had nothing to defend myself with and I was close to him, and when he come up with the neck-yoke I jumped back from the fence some four or five feet, out of reach of him with the neck-yoke, unless he would get over the fence. When he found he could not reach me with the neck-yoke, he let loose and it passed on over my head some ten or twelve steps, out nearly to the edge of the bluff. Well, then I started for the house, and I went on to the house—went in a run. As I left, I told him I would be back."

The appellant then went to his house, procured a couple of shells and his double-barreled shotgun and returned to within twelve steps of deceased, who was then standing near the wagon in the hog lot. The wire fence was between the two. Appellant was carrying the shotgun on his shoulder. What occurred thereafter is related by appellant as follows:

"Well I told him, 'Now, Mr. Ryland, I want you to tell me what you want me to do with these turkeys,

and let's not have no more foolishness.' " . . . He [deceased] said, 'I am going to tell you this, you big son-of-a-bitch, you are over on my side of the fence now and you have got that gun and, God-damn you, you use it and you use it quick, or I will get you, as sure as hell,' and he run out where the ax was laying out close to the edge of the pond and picked up the ax and, when he turned around and faced me, I said, 'Mr. Ry-land, you missed me a minute ago—now make sure of this, if you come at me with that ax I am going to use this gun just as sure as there is a God in heaven,' and he says, 'God-damn you, I ain't going to take a word off of you,' and he made a dive for the fence and about a step or two before he got on the fence I said, 'For God's sake, don't do it.'

"Q. Did he start to get over the fence? A. Yes, sir, he had one foot up in the fence and his left hand on the wire.

"Q. What, if anything, did he have in his right hand? A. Well, he had the ax in his right hand.

"Q. Do you know what kind of an ax this was? A. No, sir, I didn't know exactly what kind. I could just see it was an ax, and that was all.

"Q. What did you do when he got up on the fence? A. Well, I emptied the gun.

"Q. What did you shoot him for? A. Well, it was just this; I knew it would be only a few seconds until he would be on me with that ax and I knew that it had come that one or the other of us had to go and I shot him to save my own life."

After the shots were fired appellant saw deceased go towards the boxes, and appellant turned around and started to his home, and after turning around took the empty shells out of his gun.

On cross-examination appellant testified that deceased had told him that he always went armed, and for that reason appellant didn't want to argue with a man who was armed when he himself was unarmed, and for that reason he went home to get his gun and have it with him if he needed it. That he knew the

longer the deceased brooded over the difficulty the madder he would get.

Defendant in further explanation of why he went back the second time said, ''Well, I went down there to see if I could settle the difficulty without any further trouble if I could, because I wanted to settle it while it was new. He and I had been good friends, and I thought probably I could do it in that way, and I took the gun along with me to defend myself if I couldn't.''

On further cross-examination appellant, when asked why he did not leave the scene just at the time deceased threatened him and picked up the ax, said, ''Well, I thought he was armed or he would not approach a man that way; that is, I expected him to open up on me if I had left.'' He further testified on cross-examination that he went down ''knowing deceased's disposition and expecting there would be some shooting.'' Appellant further testified that deceased's reputation for being a quarrelsome, dangerous, turbulent man was bad.

The physician and the embalmer who examined the deceased's body afterwards found that about one-hundred and fifteen No. 6 shot had penetrated the body between the collar bone and the groin, puncturing arteries in four or five different places, and causing the immediate death of the deceased.

A large number of witnesses testified that the reputation of the appellant, as a quiet, peaceable, law-abiding citizen was good, and a large number of said witnesses testified that the reputation of the deceased as to being a quarrelsome, turbulent and dangerous man was bad.

In rebuttal a large number of witnesses testified for the State to the effect that the reputation of deceased for peace, quietude and good citizenship was good.

I. It is contended that the court erred in excluding evidence of specific turbulent prior acts of the deceased towards third persons, which acts were known to the appellant. Upon an examination of the bill of ex-

ceptions we discover that this point has not been suffi-
ciently preserved to justify a discussion of the same.
When the appellant was on the stand he was asked
by his counsel what he knew about the con-
Preserving    duct of deceased toward men with whom he
Proffered
Testimony.    had had trouble. To this question the State's
counsel objected, and the court sustained the
objection. Thereafter no offer to prove was made by
appellant and we are therefore entirely in the dark as
to what this excluded evidence was. Absent an offer to
prove we have no sufficient basis upon which prejudicial
error may be adjudged. [Bingaman v. Hannah, 270
Mo. 611, l. c. 627; Kirkwood v. Cronin, 259 Mo. 207,
l. c. 217; Ruschenberg v. Railroad, 161 Mo. 70, l. c. 81.]

II. It is contended that the court erred in giving
Instruction No. 12, which was as follows:

"The court instructs the jury that the right to de-
fend one's self against danger, not of his own seeking,
is a right which the law not only concedes but guaran-
tees to all men. The defendant may, therefore, have
killed the deceased and still be innocent of any offense
against the law. Hence in this case, if
Self-Defense.    you believe and find that at the time de-
fendant shot deceased he had reasonable cause to ap-
prehend on the part of deceased a design to do him
some great personal injury and that there was reason-
able cause for him to apprehend immediate danger of
such design being accomplished, and that to avert such
apprehended danger he shot, and at the time he did
so he had reasonable cause to believe, and did believe,
it necessary for him to shoot to protect himself from
such apprehended danger, then and in that case, the
shooting was not felonious, but was justifiable, and you
ought to acquit him upon the ground of necessary self-
defense. It is not necessary to this defense that the
danger should have been actual or real, or that it should
have been impending and immediately about to fall.
All that is necessary is that defendant had reasonable
cause to believe and did believe these facts. But be-

fore you acquit on the ground of self-defense, you ought to believe that defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the cause you cannot acquit the defendant on the ground of self-defense, even though you may believe that defendant thought he was in danger.

"But on the other hand, the law does not permit a person to voluntarily seek or invite a combat, or put himself in the way of being assaulted, in order that when hard-pressed he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right of attack, and it will not avail in any case where the difficulty is sought for and induced by the party by any wilful act of his, or where he voluntarily and of his own free will enters into it, no matter how imminent his peril may become during the progress of the affray. The necessity being of his own creation, will not operate to excuse him. Nor is anyone justified in using any more force than is necessary to get rid of his assailant. But if he does not bring on the difficulty nor provoke it, nor voluntarily engage in it, he is not bound to flee to avoid it, but may resist with adequate and necessary force until he is safe.

"So, if you believe from the evidence in this case that the defendant Roberts voluntarily sought or invited the difficulty in which Ryland lost his life, or that he, defendant, provoked or commenced or brought it on by any wilful act of his own, or that he voluntarily and of his own free will engaged in it, then in that case, you are not authorized to acquit him on the ground of self-defense; and this is true no matter how violent defendant's passion became, or howsoever hard he was pressed, or how imminent his peril became during the progress of the affray. In determining who provoked or commenced the difficulty or made the first assault, you may and should take into consideration all the facts and circumstances in evidence before you."

We are of the opinion that appellant's own testimony in this case clearly shows that he was in the wrong in returning in the threatening, bluffing or menacing manner armed with a shotgun, to the scene of the recent difficulty, and from appellant's own testimony we think it conclusively appears that he thus intentionally provoked or brought about a renewal of the discussion or difficulty with deceased.

If appellant did this with the felonious intention of causing deceased to renew the attack so that he (appellant) might have a pretext for killing him or doing him great bodily harm, then appellant was not entitled to invoke any phase of the right of self-defense. [State v. Partlow, 90 Mo. 608; State v. Darling, 202 Mo. 150, 1 c. 172.] If, however, appellant wrongfully invoked or sought a renewal of the quarrel with the intention of merely overawing the deceased, or of holding him in check while a discussion could be had and a settlement or a mutual understanding reached as to their future status towards each other, or to accomplish any result other than the death or great bodily harm of the deceased, the appellant, while he would not be entitled to invoke the perfect right of self-defense, would under the well established rule, we think, be entitled to invoke the right known as the imperfect right of self-defense, which would reduce the crime to manslaughter in the fourth degree. [State v. Gilmore, 95 Mo. 554; State v. Partlow, supra; Kelley's Criminal Law and Practice (3 Ed.), par. 521 and cases therein cited.]

From the State's evidence it would clearly appear that appellant provoked a renewal of the quarrel with felonious intent. If this were all the evidence there would be no evidence upon which to base an instruction on any phase of the question of self-defense. This was not all of the evidence, however. The appellant in explaining his intention in returning to the scene of the trouble said: "I went down there to see if I could settle the difficulty without any further trouble if I could, because I wanted to settle it while it was new. He and I had been good friends and I thought probably I could

do it in that way, and I took the gun along with me to defend myself if I couldn't."

Upon this and other similar testimony in the record we are of the opinion that appellant was entitled to have the court instruct on the law of the imperfect right of self-defense.

The above instruction fails to properly instruct on this phase of the law of self-defense and was we think for that reason erroneous.

We are of the opinion there is no evidence in this case which will justify an instruction on the perfect right of self-defense, and since this is true, that portion of the instruction which deals with the perfect right of self-defense is more favorable to appellant than the evidence would warrant. However, lest we might be misunderstood as approving the *form* of the instruction on that phase we desire to say that the sentence, "nor is any one justified in using any more force *than is necessary* to get rid of his assailant," has no proper place in an instruction on self-defense. [State v. Banks, 258 Mo. 479, l. c. 492; State v. Hollingsworth, 156 Mo. 178, l. c. 186.]

Neither should the unmodfied clause, "voluntarily engage in it" or "that he voluntarily and of his own free will engaged in it" be used in an instruction dealing with the subject of self-defense. [State v. Gordon, 191 Mo. 114, l. c. 120 et seq; State v. Hopkins, 278 Mo. 388.]

III. Appellant further contends that the court erred in refusing to give his instruction "D." This instruction deals solely with the law on the perfect right of self-defense. We have stated above that we do not find any evidence in the record upon which Perfect Self-Defense. to base an instruction on the perfect right of self-defense. For this reason the court did not err in refusing the instruction.

The judgment is reversed and the cause is remanded.

*Goode, J.,* concurs; *Blair, J.,* concurs in a separate opinion, in which *Woodson* and *Graves, JJ.,* join; *Walker, C. J.,* dissents in a separate opinion, in which *Williamson, J.,* joins.

BLAIR, J., (concurring).—I agree there is evidence tending to prove facts justifying the giving of an instruction on the law of imperfect self-defense, but dissent from the ruling that there is no substantial evidence tending to prove appellant acted in the exercise of the right of perfect self-defense. In my opinion there was such evidence. Whether it was worthy of credence was a question we are unauthorized to decide. That was for the jury. The instruction set out in the majority opinion is bad for the reasons given and for others. I concur in the result of the majority opinion. *Woodson* and *Graves, JJ.,* concur.

WALKER, C. J., (dissenting).—I do not concur in the majority opinion.

I. Appellant's testimony is the sole support for the contention that he was entitled to an instruction for manslaughter in the fourth degree. A summary of this testimony is to be found in his explanation of his intention in returning to the scene of the trouble. We give it in his own words: "I went down there to see if I could settle the difficulty without any further trouble, if I could, because I wanted to settle it while it was new. He and I had been good friends and I thought probably I could do it in that way, and I took the gun along with me to defend myself, if I couldn't."

Manslaughter.

This testimony is to be measured by the rules governing the testimony of other witnesses. [State v. Martin, 230 Mo. 680.] If such testimony is not found to be at a variance with defendant's other testimony and the physical facts to the extent of being unreasonable and contrary to the ordinary experience of mankind, then the instruction should be given. [State v. Ander-

son, 89 Mo. 332; State v. Gilmore, 95 Mo. l. c. 565;
State v. Musick, 101 Mo. 272; State v. Bryant, 102 Mo.
24; State v. Turlington, 102 Mo. 642; State v. Tal-
mage, 107 Mo. l. c. 570; State v. Nelson, 118 Mo. l. c.
126; State v. Brown, 119 Mo. l. c. 538; State v. Pol-
lard, 139 Mo. l. c. 228; State v. Hancock, 148 Mo. 488;
State v. Holloway, 161 Mo. l. c. 144; State v. Hamilton,
170 Mo. 377; State v. Fraga, 199 Mo. l. c. 136; State
v. Vaughan, 200 Mo. l. c. 22; State v. King, 203 Mo.
l. c. 571; State v. Arnold, 206 Mo. l. c. 600; State v.
Tucker, 232 Mo. l. c. 18.]

No fell purpose is evident from the tenor of appel-
lant's explanatory testimony, except the presence of the
shotgun. On the contrary, its spirit in other respects
is commendable, in manifesting a desire to avoid fur-
ther difference with the deceased. Thus it may be in-
terpreted as it stands alone. It, however, should be
construed in conjunction with appellant's other testi-
mony and the unquestioned physical facts. Looking to
this source of enlightenment, we find that the appellant
sought the presence of the deceased, bandied words with
him, abusive on each side, concerning a minor difference
between them. Whereupon, the deceased threw a neck-
yoke at the appellant. The latter left the scene, saying
he would return shortly, and went to his residence, one-
eighth of a mile distant. The deceased did not pursue
him or manifest any intention to continue the difficulty.
Instead of remaining away, the appellant returned at
once, armed with a loaded double-barrelled shotgun.
Ignoring, at this juncture, the testimony of the colored
man, the only other witness to the killing, as to the
opprobrious words applied by the appellant to the de-
ceased, appellant's testimony discloses that he returned
to the premises of the deceased and some further words
passed between them; that when he was within about
seventy-five feet of the deceased, the latter picked up an
old ax and was about to advance towards the appellant,
whereupon the latter shot twice in rapid succession, kill-
ing the deceased almost instantly.

In the face of these facts, we are asked to give credence to the attempted mitigatory plea of the appellant, that his purpose in returning to the scene was purely pacific; that his going away, the former difference having ended, left no time for deliberation; that his procuring the loaded shotgun and returning to the scene marked no malign purpose, but indicated that the symbolical dove was hovering over his disposition. This is the first instance in the turbid history of human passion that a loaded shotgun has been used to typify an olive branch. The proper disposition of this question, however, is a matter of too serious import in the enforcement of the law against crime to be disposed of by decorating it with the furbelows of rhetoric. It demands for its just disposition, plain, stern words, rather than figures of speech. The value, in truth, of testimony, and hence the credence which should be given to it, may fairly be tested by average human experience or what the ordinary man would most reasonably be expected to do under like circumstances. Thus measured, in the light of all the attendant facts, the appellant's testimony falls short of manifesting the purpose its mere words would indicate. It is in ill accord with the usual actions of men that when one is well away from recent trouble, and one knows that his adversary, as appellant states, was a turbulent man, will return to the latter's presence to mollify his anger, armed with a deadly weapon. Thus accoutered, the return of the appellant immediately following the former difficulty constituted a menace rather than a means of mediation. Peacefully inclined men do not resort to such aids or assume such attitudes to further their inclination to avoid trouble.

In addition, the presumption of malice attending the use of a deadly weapon must obtain if, as we maintain, appellant's testimony is unworthy of belief. This would preclude the giving of the instruction for manslaughter. [State v. Bauerle, 145 Mo. 1; State v. Musick, 101 Mo. 260.]

We are, therefore, of the opinion that the testimony of the appellant, as to the reasons prompting him to

return to the scene of the killing is but a weak pretext to hide a purpose deliberately formed to wreak his malice upon the deceased, and that such an interpretation is authorized by the other evidence. So construed, sustained by the array of authorities we have cited, no instruction for a lower grade of homicide than that given was authorized.

II. The giving of instruction numbered 12, on self-defense, is assigned as error in the majority opinion. On the appellant's own testimony, he was guilty of murder in either the first or second degree. He went to the scene of the difficulty armed with a deadly weapon and, under a fair 'interpretation of all of the testimony, viewed in the light of human experience, he brought on the difficulty. Under such circumstances, an instruction for self-defense was not authorized (State v. Larkin, 250 Mo. 218; State v. Miles, 253 Mo. 427), and in its giving appellant was favored and has no cause of complaint.

Self-Defense.

III. The judgment of the trial court herein should be affirmed. *Williamson, J.*, concurs in this dissent.