## THE STATE v. MANNIE BANKS, alias GEORGE WILLIAMS, alias TED BANKS, Appellant.

**Division Two, May 26, 1914.**

1. **HOMICIDE:** Self-Defense: Resisting Officer: Instructions Must be Based on Evidence. Where a defendant on trial for killing an officer based his entire defense upon the theory that he shot in self-defense, *not knowing that deceased was an officer*, an instruction was properly refused to the effect that, even though defendant knew deceased was an officer, yet if deceased used unnecessary force and means to effect the arrest, and defendant had good reason to believe and did believe that by reason of such unnecessary force the deceased was about to kill him or do him great bodily harm, then defendant had a right to shoot in self-defense.

2. ————: ————: Reasonable Fear of Impending Death or Harm: "Unnecessary" Killing. It is error to include in an otherwise correct instruction on self-defense, the statement that if the defendant shot the deceased unnecessarily, there could be no self-defense in the case. If a person believes he is about to be killed or about to receive great bodily injury, and he has good reason so to believe, then he has the right to shoot in self-defense, even though it should afterwards develop that the appearances were false and that the killing was in fact unnecessary.

3. **WITNESSES:** Impeachment of Accused: Evidence of Other Crimes: No Convictions Shown: Affording Cause for Attempted Arrest by Deceased Officer. It is not proper to impeach an accused as a witness by proving that he has committed other crimes for which no conviction is shown to have occurred. Nor, where accused is charged with having killed an officer, is such evidence admissible to show cause for an attempted arrest without warrant, unless it appear that the officer had knowledge of said crimes and of defendant's connection with them.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

REVERSED AND REMANDED.

*Philip D. Clear* for appellant.

(1) Whenever an officer attempts to arrest a citizen in such a threatening and menacing manner, or by such unnecessary means and force as to reasonably induce an apprehension on the part of the citizen that he is in danger of his life or of great bodily harm at the hands of such officer, the officer becomes a trespasser and invites resistance, and the citizen even though he knows the officer to be fully authorized to make the arrest may repel force with force, even to the extent of taking life, in his own defense the same as if the officer had been a private citizen. State v. Plummer, 135 Ind. 308; State v. Oliver, 2 Houston (Del.), 605; State v. Vann, 45 Tex. Cr. 434; North v. People, 139 Ill. 81; People v. Burt, 51 Mich. 199; Simmerman v. State, 14 Neb. 568; State v. Noles, 26 Ala. 31; Reneau v. State, 2 Lea, 720; Wharton on Homicide (3 Ed.), p. 621; 1 Bishop on Criminal Procedure, sec. 162; State v. Coleman, 186 Mo. 156; State v. Lane, 158 Mo. 587; State v. Jones, 29 S. C. L. 213; State v. Barrett, 170 Mo. 671.   (2) The prosecution erred in systematically presenting to the jury a large number of criminal transactions imputing that defendant was guilty of each and all of them, well knowing that none of said alleged offenses were within the knowledge of Howard or Marshall at the time of the homicide, and were not a part of the ground on which said arrest is said to have been made, and well knowing that the imputation to defendant of having committed so many criminal offenses would raise a false issue before the jury, that defendant was a bad, very bad man, and ought to be hung, and would thereby enable him to

secure a hanging verdict. This is reversible error. State v. Prendible, 165 Mo. 359; State v. Wellman, 253 Mo. 302; State v. Webb, 254 Mo. 414; 1 Wharton's Crim. Ev. (10 Ed.), sec. 475; Buell v. State, 104 Wis. 132; State v. Houx, 109 Mo. 663; State v. Parker, 96 Mo. 390; 1 Greenleaf on Evidence, sec. 459.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State.

(1) Instruction 8 told the jury that if defendant did not know deceased was a police officer at the time he shot him, then the killing was justifiable, but if defendant knew deceased was a police officer and shot him in resisting arrest, then there was no self-defense in the case. State v. Duncan, 116 Mo. 312; State v. Cushenberry, 157 Mo. 181; State v. Crafts, 164 Mo. 653; State v. Evans, 161 Mo. 108; State v. Albright, 144 Mo. 644; State v. Fuller, 96 Mo. 168; State v. Holcomb, 86 Mo. 381; Keady v. People, 66 L. R. A. 353; State v. Meyers, 33 L. R. A. (N. S.) 144; Anderson v. State, 133 Wis. 610; State v. Spaugh, 200 Mo. 604; State v. Dierberger, 96 Mo. 672; State v. Vaughan, 200 Mo. 1. (2) On cross-examination defendant was questioned with reference to a statement he had signed wherein he stated that he had committed several crimes just previous to the homicide. Objection was made to a recital therein to the effect that defendant had held up two men on Southwest boulevard in Kansas City. This objection was not on account of the testimony relating to a crime other than that for which defendant was being tried, but was because Officer Howard was not aware of the commission of this crime at the time he attempted to arrest the defendant. It is immaterial whether Howard knew of this crime or not. At the time the attempt to arrest defendant was made the officers suspected him of carrying concealed weap-

ons which proved true. They detected him in the actual commission of a felony. That he was guilty of other felonies unknown to the officers at that time was immaterial. They suspected him of being a felon and had a right to arrest him. They need not have suspected him of any particular felony. State v. Evans, 161 Mo. 108.

WILLIAMS, C.—At the September term, 1912, of the criminal court of Jackson county, defendant was tried and convicted of murder in the first degree for the killing of one Robert Marshall, and his punishment assessed at death. The homicide occurred near the corner of Nineteenth and Grove streets, Kansas City, Missouri, at about 11:30 p. m., August 10, 1912. Deceased was a colored policeman. Defendant is a negro and was about twenty years of age at the time.

Just prior to the killing, defendant was standing on the sidewalk, on the south side of Nineteenth street, a few feet west of its intersection with Grove street, talking to one Nadine Monroe, a negro woman, who was standing in an adjoining yard. At this time two negro policemen, the deceased and Thomas W. Howard, dressed in plain clothes, were patrolling the street together and came up to where defendant was standing. Officer Howard testified for the State that he was not acquainted with the defendant at the time of the occurrence, but knew him by sight, and that as he and deceased came up to defendant, witness asked the defendant his name and where he lived. Defendant relied that his name was "Ted Smith" and that he lived down on Sixth street. The witness saw a big bulge on defendant's right side, under his waistband, and, on account of this, he told defendant that "they" were police officers and that they wanted to search him and told defendant to throw up his hands. Witness also testified that at the time he told defendant they were officers, "I done my coat like that [indicat-

ing.]'' Witness further testified that thereupon he
started to search defendant, feeling around the defend-
ant with his hand and when his hand touched the bulge
under the waistband ''it rattled like new leather'' and
that it felt like a large gun and that he knew it was a
gun encased in a leather scabbard. Just as witness's
hand touched the bulge under defendant's waistband,
defendant struck witness with his fist, knocking him
down, and then ran down the street toward Grove
street and turned south on the west side of Grove
street. Officer Marshall, the deceased, pursued the de-
fendant and was four or five feet behind him as they
went around the corner. A second or two after de-
fendant and deceased turned the corner on Grove
street, witness heard one shot. Witness was some-
what ''dazed'' by the blow but was able to get up and
then ran in the direction that defendant and Officer
Marshall had gone, and a short distance down Grove
street, out in front of a stairway at No. 1910 Grove
street, he found officer Marshall dead. All the shots
had been fired out of his gun but the witness did not
know whether deceased's gun was fully loaded at the
time the trouble began.

Witness said that they did not have a warrant for
defendant's arrest, but that they had orders to search
persons that looked suspicious. Later the witness was
recalled and testified as follows: ''Well, when Officer
Marshall and I came down the street, I was told there
was some shooting over in the jungles, that a white
man got held up over there in the sand yard. We
went over there, and we seen this boy there, and I saw
that bulging there. I had kind of a suspicion that he
had a gun and I went to searching him.''

After the witness went down to where the shoot-
ing occurred, he went up the stairway and through the
building and down the back stairway into the back
yard where he made an unsuccessful search for the
defendant.

Nadine Monroe testified that she was eighteen years old and that she and the defendant had been staying at the Henderson Hotel at Eighteenth and Tracy streets in Kansas City, Missouri, for about a week prior to the shooting; that on the night of August 10, 1912, she was talking to the defendant, near the corner of Nineteenth and Grove streets, when the two officers came up and asked defendant his name; that defendant said his name was ''Ted Banks;'' that Officer Howard disputed the name given and pulled defendant out on the sidewalk and began to search him and that defendant hit the officer and ran, with Officer Marshall in pursuit; that as defendant started to run she heard Officer Marshall call upon him to ''Halt;'' that as Officer Marshall was going around the corner she saw him reach for his gun and just as they turned the corner she heard one shot fired but did not know who fired it; that she heard six shots fired but that she did not go around the corner and did not know who did the shooting; that she immediately went to the Henderson Hotel to defendant's room and in a short time defendant came to his room. A man by the name of Ward was there and defendant sent Ward to get his clothes and also some beer. Ward returned with the beer and some clothing. A girl named Virginia Childs returned with Ward. Defendant changed his clothing and ''put on Ward's lavender shirt;'' that defendant asked Virginia Childs to ''come on down and see if the way was clear of the law.'' Witness, together with defendant and Ward and Virginia Childs, left the building and went to Fifteenth and Tracy streets and at that place Virginia Childs said to defendant, ''I see two laws,'' and defendant replied, ''I don't care, did you see what two laws got on Nineteenth and Grove?'' Virginia Childs asked defendant how he felt and defendant replied: ''I feel like any other man; that wasn't the first man I ever put off,'' and that defendant said: ''I don't care, all I hated, it was

a colored man and not a white man." He further
stated that he "hated" to kill a colored man. The
party walked to Thirteenth and Main streets, where
the Childs woman left them, and defendant and the
witness went to the Union Depot and defendant in-
quired as to what time he could get a train for St. Joe.
Upon learning that the next train would not depart un-
til 6:30 in the morning, witness and defendant ob-
tained lodging at a rooming house on West Twelfth
street where they stayed until Monday morning, when
defendant went away. The witness further testified
that at the time the officers attempted to search de-
fendant he had a "gun on him" and that she had seen
him "put it on."

Virginia Childs testified that just before the shoot-
ing, she was standing on the northeast corner of Nine-
teenth and Grove streets and saw the two officers ap-
proach the defendant across the street from her; she
could not hear what was said but she saw the officers
talking to defendant and saw Officer Howard fall and
the defendant run, pursued by Officer Marshall; that
defendant ran around the corner and turned into the
stairway at 1910 Grove street. Witness did not know
how many shots were fired but stated that most of
them were fired by Officer Marshall and that she
thought Officer Marshall fired the first shot; she did not
know whether deceased shot to hit defendant; that she
ran across the street toward the stairway up which de-
fendant had gone and that she heard deceased say
"Come out" once, and that she also heard him say
"Bring me a light, Maud." That a short time after de-
fendant went into the stairway she saw a flash from de-
fendant's gun and saw deceased fall. The witness af-
terwards saw two bullet holes in the door near the
stairway. After the shooting, the witness and a man by
the name of Ward went down to the hotel where defend-
ant was staying and that defendant said he was going
to St. Joe; that at defendant's request she went down

"to see if the coast was clear of the law" and that they then walked to Thirteenth and Main streets; that on the way down the street, defendant said he "hated to kill a colored man" and that he "could have gone over the stairway without doing it" but that "the man had called him a black s— of a b— and shot at him." That after the shooting, defendant had a "big gun" with him. Witness also testified that at the time of testifying she was under a ten-year sentence for robbery and was being detained at the jail until she could be taken to the penitentiary.

Lilly Marshall testified that on the night of the homicide she was sitting out on the front porch at 1910 Grove street, about 11:30 p. m., and saw the defendant come running around the corner with the deceased running after him and that deceased ordered defendant to halt and fired a shot in the direction of defendant and that thereupon defendant turned into a nearby hallway and ran up the steps. Deceased then fired two more shots and asked the witness for a light. Witness took a lamp to the door and deceased exclaimed "Look out." Witness shut the door and then heard two shots fired after that; that defendant fired two shots and that she then heard him go down the back stairs; that the witness then returned to the front door and found Officer Marshall dead. After deceased quit shooting, the witness heard two shots fired from the stairway.

J. L. Ghent, a city detective, testified that he, with twelve other officers, arrested defendant at 1410 West Twelfth street in Kansas City; that the defendant made no resistance to the arrest after seeing the number of officers that were present; that after defendant was taken to headquarters he admitted that he had shot Officer Marshall and that the reason he had shot him was because he did not know that he was a police officer and that as he went in the stairway he fell and fired one shot at the bottom of the stairway and then

ran up the steps and fired another shot down the steps; that a 38 Colt's revolver was found in defendant's room when he was arrested and that defendant said the gun and scabbard were his and that he always wore it around his waist and kept the gun down inside of his pants. The revolver and scabbard were produced at the trial and identified by the witness.

Dr. Czarlinsky, the Coroner, testified that in his official capacity he viewed the dead body of Officer Marshall on August 11, 1912, and found the bullet wound upon the body of the deceased about two inches below the collar bone and about one-half inch to the right of the middle of the breast, and that a post-mortem examination showed that the bullet had pierced the ascending aorta and had dropped into the pleura cavity and that the pleura was filled with blood, indicating that deceased had died from the effects of the bullet wound.

Alexander Johnson, a city detective, testified that defendant told him that, "He killed Officer Marshall and that if he had been out he was going back to kill Officer Howard; that he was after Officer Howard more than he was after Officer Marshall."

Defendant took the stand in his own behalf and testified that he was a laborer and that on the night of the trouble he was standing near the corner of Nineteenth and Grove, talking to Nadine Monroe, when the deceased and Officer Howard approached; that he had never seen either of them before and did not know that they were police officers or officers of any kind. That neither of said officers told him that they were police officers or that they were officers of any kind and that Officer Howard did not show him his star; that Howard asked him his name and that he replied, "Ted Banks;" Howard then said, "That isn't your name," and said: "Throw up your hands, let us see what you have got on you;" and that Howard then caught him by the arm and "snatched" him out on the

sidewalk and told him to throw up his hands and commenced to search him and that while Howard had one hand behind him and one hand in front of him, defendant knocked him down. Defendant admitted that, at the time, he had a gun in his left-hand coat pocket and had a paper bag over the muzzle of it but that Howard did not touch his coat pocket in making the search. Defendant testified that on account of the rough way in which he was being handled, he thought Howard was going to rob him and that after Howard had jerked him, he struck Howard with his left hand, knocking Howard down, and turned and ran; that just after he started to run a shot was fired by Marshall; that after he ran around the corner he ran into a doorway and stumbled and fell over the first step of the stairway inside. The steps were about three feet inside of the doorway; that, as he fell, his gun dropped out of his pocket and that as he started to get up deceased ran up to the doorway and fired two shots at him. Deceased was about to fire another shot at him and that he then started to back up the stairway with his gun in his hand; that up to that time deceased had fired three shots and that as deceased pointed his · gun at the defendant to fire the fourth time defendant pointed his gun toward the deceased, but that the deceased shot so quick that it scared defendant and prevented him from shooting; that defendant had backed up the stairway about three steps and that deceased was in the act of shooting again when the defendant shot his first shot which missed the deceased and that he then fired a second shot which hit the deceased; that the deceased never told him to halt and that just before the deceased fired the last shot he said to the defendant, "You black s— of a b—, I'll kill you," and that deceased said nothing else during the time; that seven shots were fired, five by deceased and two by defendant.

Defendant testified that when Officer Howard first came up to him and asked him his name he (Howard) talked like a man that was drunk; that after the shooting he went to the hotel at Eighteenth and Tracy streets. He denied all of the conversations attributed to him by witnesses Nadine Monroe and Virginia Childs. He changed his clothes upon going to his room; that he stayed in Kansas City until he was arrested and went out on the street every day and every evening as usual. He also denied making the statement to Officer Ghent to the effect that he wished that he had killed Officer Howard instead of Marshall.

On cross-examination, defendant was handed a written instrument marked ''Exhibit B,'' which purported to be signed by him, and he was asked if the signature was his and he replied that it was. Thereupon, over the objection and exception of defendant, the State was permitted to read into the evidence the signed statement of defendant which was as follows:

''K. C. MO. 9/3/1912. From Teddie Banks. Ward and I pulled off a job worth $55 out on the Santa Fe railroad just below where the Independence car crosses the track, these people were colored, one of the men there was blind, the old woman was old and had one eye and the man was old and sick. at the time which was the 4 or 5 of Aug, or on the night it rained so bad in the early part of the month. We also pulled off two or three jobs of highway robbery around Tracy and 19th and Harrison sts, dates I don't remember but they was in July last past and 1st of Aug, This house was on the south side of the track near the sand yard, below the show grounds. We also held up two men on the Southwest Boulevard on the bloofe driveway near Allen ave, and two on the 24th st during July 15, 16 or 17, or near that part of the mo.''

Defendant admitted on cross-examination that in October, 1909, he was convicted for an assault with intent to kill at Atchison, Kansas, under the name of

George Williams, and that later he was convicted of burglary in Toledo, Ohio, under the name of John Davis.

I. Appellant contends that the court erred in refusing defendant's instruction numbered 5. This instruction embodied the proposition that even though defendant knew deceased was an officer, yet if deceased used unnecessary force and means to effect the arrest of defendant, and that defendant had good reason to believe and did believe that by reason of such unnecessary force the deceased was about to kill him or do him great bodily harm then defendant had a right to shoot deceased in self-defense.

*Instructions: Must be Based on Evidence.*

Section 5121, Revised Statute 1909, provides that "If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest." But the officer is not justified in using unnecessary force in making an arrest. The rule with reference to the right of the person sought to be arrested to resist unnecessary force on the part of the arresting officer is stated by an able writer, as follows:

"An officer seeking to make an arrest may only use such force as is reasonably necessary to subject the person sought to be arrested to his authority; and where he goes further, and uses unnecessary force, the rule applicable to a private individual attacked by another, that if a person believes, or has reason to believe, that he is in danger of receiving great bodily harm, he may defend himself to a reasonable extent, applies. . . . A person sought to be arrested may oppose a felonious aggression in the execution of the arrest, even to slaying the officer when necessary to save his own life, or to save himself from serious bodily harm." [Wharton on Homicide, (3 Ed.), p. 621, sec. 401.]

While it will be seen from the above authority that defendant's instruction is correct as an abstract proposition of law, yet we have come to the conclusion that the testimony in this case is not such as to call for the giving of said instruction. The theory of the State was that defendant shot the deceased while knowingly resisting a lawfully attempted arrest. The theory of defendant was that he shot in self-defense, *not knowing* that the deceased was an officer undertaking to arrest him. In a proper case, where the evidence showed that the defendant knew the aggressor was an officer attempting to arrest him and that the officer used unnecessary force in so doing, and that defendant believed and had good reason to believe, that he was about to be killed or about to receive great bodily injury by reason of such unnecessary force, and shot to defend himself against such unnecessary force, such an instruction would be proper, but where, as here, there is no such evidence; but on the other hand the entire defense is based upon the theory that defendant *did not know* the aggressor was an officer, attempting to arrest him, the evidence does not justify the giving of such an instruction.

The court did instruct on self-defense, based upon the theory that defendant did not know the deceased was an officer. That instruction will be discussed in the following paragraph.

II. Instruction numbered 8 given by the court on self-defense was as follows:

Instructions: Self-Defense: "Unnecessary" Killing.

"The court instructs the jury that if they find and believe from the evidence in this case that the defendant, Mannie Banks, alias Ted Banks, did not know that the deceased, Robert Marshall, was a police officer at the time that the defendant shot deceased (if you find from the evidence that the defendant did shoot deceased), then the defendant had the right to shoot deceased if

apparently necessary to save defendant as defined in instruction No. 9. The court further instructs the jury that if the defendant shot Robert Marshall *unnecessarily*, or in knowingly resisting a lawful arrest, attempted in a lawful manner there can be no self-defense in the case."

Instruction numbered 9 to which reference is made in the above instruction, was in the form of the usual self-defense instruction.

It will be noticed that by instruction numbered 8, the jury were told that "if the defendant shot Robert Marshall *unnecessarily* . . . there can be no self-defense in the case." This constituted error. By this portion of the instruction, defendant was virtually deprived of his right to act on appearances if he had good reason to believe and did believe that deceased was about to kill him or do him great bodily injury. It is true that in the first part of instruction numbered 8, and also in No. 9, the jury were told that if defendant had good reason to believe and did believe that deceased was about to kill him or do him great bodily injury that then the defendant had the right to shoot in his own defense, yet the clause above referred to, in effect, flatly contradicts his right to act upon appearances, and in a way nullified the other portions of said instructions. [State v. Darling, 202 Mo. 150, l. c. 165.] If a person believes he is about to be killed or about to receive great bodily injury and he has good reason to so believe then he has the right to shoot in self-defense, even though it should afterwards develop that the appearances were false and that the killing was, in fact, unnecessary. To hold that killing in self-defense could only occur when absolutely necessary would be to deprive defendant of his right to act upon appearances and thereby, in a large measure, destroy the right of self-defense. [State v. Sloan, 47 Mo. 604.]

III. Over the objection and exception of defendant the court permitted the State to read the written statement "Exhibit B," which tended to prove that defendant, at other times, had committed the crime of robbery. The crimes referred to in said statement were separate and distinct from the crime for which defendant was being tried. As a general rule, it is well settled that evidence of separate and isolated crimes is not admissible to prove the commission of the crime for which the defendant is being tried. [State v. Spaugh, 200 Mo. 571.] There are certain well-defined exceptions to this general rule, however (not necessary to here state or discuss), and when evidence of other crimes is admissible for any purpose, it will not be excluded because it may also prove the commission of another crime. [State v. Gordon, 253 Mo. 510.] Also when the defendant becomes a witness it is proper to prove his *conviction* of other crimes. This is made so by statute on the ground that it affects the credibility of the witness. [Sec. 6383, R. S. 1909; State v. Blitz, 171 Mo. 530.] But it is not proper to impeach the defendant as a witness by proving that he committed other crimes in which no conviction is shown to have occurred. [State v. Vandiver, 149 Mo. 502; State v. Spray, 174 Mo. 569; State v. Phillips, 233 Mo. 299.] From the record in this case it appears that the trial court was of the opinion that this evidence was admissible as showing cause that the deceased officer may have had in attempting to arrest defendant without a warrant under the rule discussed in the case of State v. Spaugh, 200 Mo. 571, l. c. 595-596. But the facts in the present case are not such as to call for the application of the exception to the general rule announced in the Spaugh case. In the present case there was no showing made that the deceased officer knew of, or had any knowledge concerning, the commission of these other crimes, or of defendant's connection there-

<div style="margin-left:2em">Evidence of Other Crimes.</div>

with, at the time of the attempted arrest, but the evidence shows that the arrest in the present case was attempted because the officers saw the "bulge" under defendant's waistband and suspected that he was thereby committing a felony, to-wit, carrying concealed weapons.

Under the facts developed in the present case, said Exhibit "B," was not admissible for any purpose, and the court, therefore, committed error in admitting the same over defendant's objection and exception.

The judgment is reversed and the cause remanded.
*Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. *Walker, P. J.,* and *Brown, J.,* concur; *Faris, J.,* not sitting.