THE STATE v. WILLIAM L. ROBERTS, Appellant.

Division Two, June 8, 1922.

1. **MURDER: Sufficient Evidence: Cooling Time: Self-Defense.** Defendant's turkeys had been trespassing upon deceased's premises and eating his corn at a pen where he was feeding about a hundred hogs. Deceased asked defendant's boys to tell their father to keep the turkeys off of his premises until he removed the hogs. Soon afterwards defendant went to the pen where deceased was unloading corn, and hot words ensued, and deceased threw a neck-yoke over the wire fence at defendant, which fell eight or ten steps behind him. Defendant then went rapidly towards his house, saying, "I will be back in a few minutes." The house was forty rods away, and defendant loaded his shotgun, returned with it to the pen, and before deceased advanced a step addressed him in language which was equivalent to a challenge to mortal combat. Deceased, still inside the fence, picked up an ax, went to the fence, put one hand on a post and one foot on a wire, as if to get over the fence, when defendant, standing twenty-five feet away, fired both barrels of the shotgun in quick succession, killing deceased. Defendant testified that he knew deceased was armed, and that he went back with the gun with the intention of using it if he had to. *Held,* that when defendant went to his house he was out of danger and there was ample cooling time, and the jury were justified in finding that he returned to the pen for the purpose of renewing the quarrel and with the intention of taking deceased's life. *Held,* also, that there was no room in the case for an instruction on self-defense.

2. ————: **Self-Defense: Imperfect Right: Felonious Intent.** The instructions given in this case correctly declared the law of self-

defense and of the imperfect right of self-defense; but defendant's own testimony shows that, after he had returned to his house, forty rods from the scene of the first quarrel and was entirely out of danger, he returned with the felonious purpose of renewing the quarrel, and therefore no instruction on self-defense should have been given.

3. ———: ———: **Trespasser: Retreat.** Where defendant, after the first quarrel, went to his house, forty rods away, loaded his shotgun, returned to the scene, which was on deceased's premises, and was in effect ordered to leave, and there was a space of twenty-five feet and a four-foot fence between them, and no imminent danger, defendant should have withdrawn, although deceased made a hostile demonstration with an ax: and a plea of self-defense was not available. If one can avoid an assault by retreating, or if there is any other alternative, he is not justified in taking the life of his assailant.

4. ———: ———: **Justification: Burden.** The burden is not on the State to prove that the killing was without justification. The burden is upon the defendant to prove any affirmative matter in excuse, justification or extenuation of the homicide, and to show to the reasonable satisfaction of the jury that he acted in self-defense; and instructions which place the burden on the State are too favorable to defendant.

5. ———: **Apprehension.** It is only when one has reasonable cause to apprehend immediate danger that he may act upon appearances, and the instruction on the subject given in this case was too favorable to defendant.

6. ———: **Instructions: Omitting Defenses.** · Instructions for the State covering the entire case are not erroneous because they omit a defense set up by defendant. Where the State's instruction omits some feature which is not an element of its cause of action, but of a defense set up, the omission may be cured by instructions for defendant submitting that feature. Besides, in this case the omitted feature was self-defense, and there was no evidence constituting a submissible case of self-defense.

7. ———: **Turbulent Character of Deceased: Specific Instances of Lawlessness.** It is not error to refuse to permit defendant to testify to specific acts of violence on the part of deceased towards others known to defendant prior to the homicide, or to conversations with deceased in which deceased told of troubles he had had with others. Such testimony is not admissible to prove deceased was a lawless, turbulent or dangerous man; his violent or turbulent character can be proven only by witnesses who knew his general reputation in the neighborhood in which he lived.

8. **ARRAIGNMENT:** Waiver. An announcement by defendant of ready and going to trial is equivalent to a plea of not guilty, and is a waiver of formal arraignment.

Appeal from Callaway Circuit Court.—*Hon. E. S. Gantt,* Judge.

AFFIRMED.

*Jesse W. Barrett,* Attorney-General, and *J. Henry Caruthers,* Special Assistant Attorney-General, for respondent.

(1) There is substantial evidence of defendant's guilt. (2) The weight of the evidence is for the jury, and this court will not disturb same. State v. Yondell, 201 Mo. 662; State v. Espenschied, 212 Mo. 223; State v. Arnett, 210 S. W. 83. (3) To properly bring alleged erroneous admission or exclusion of the evidence before this court, the particular testimony complained of should be indicated in the motion for a new trial. State v. Holden, 203 Mo. 584; State v. Brown, 168 Mo. 474; State v. Whitsett, 232 Mo. 529. (4) The instructions given by the court fully and correctly declared the law applicable to the evidence in this cause. (5) The instructions refused by the court were properly refused as the given instructions fully and completely covered the case. (6) Instructions given must be taken and read together as a whole. State v. Sykes, 191 Mo. 83; State v. Brown, 188 Mo. 465; State v. Deitz, 235 Mo. 341. (7) The defendant was present in person and by counsel when the case was called for trial and, by counsel, announced ready for trial. The trial thereupon proceeded without objection by counsel for defendant for failure of record to show arraignment and plea, and the same was participated in by defendant. The defendant was found guilty by the jury of murder in the second degree, which is a felony less than capital. This action of the defendant constituted a waiver of both arraignment and entry of a plea of not guilty and is not reversible error. State

v. O'Kelly & Fitch, 258 Mo. 372; State v. Loesch, 180
S. W. 879; State v. Hascall, 226 S. W. 21; State v. Al-
len, 267 Mo. 55; State v. Gould, 261 Mo. 703; State v.
Jennings, 213 S. W. 423.

HIGBEE, P. J.—On September 17, 1917, the Prose-
cuting Attorney of Boone County filed an information
charging the defendant with murder in the first degree
for having shot and killed William A. Ryland on July
30, 1917. There was a trial and conviction which was
reversed on appeal, and the cause remanded for a new
trial. [State v. Roberts, 280 Mo. 669.] On November
15, 1920, the cause again went to trial before a jury,
resulting in a verdict of guilty of murder in the second
degree, and assessing the punishment at imprisonment
in the penitentiary for a term of twenty-five years.

The only living eye-witnesses of the homicide are the
appellant and one Charles Palmer, an elderly colored
man, employed by the deceased as a farm hand. Roberts
and Ryland, the deceased, owned and lived on adjoining
farms, situated about three miles southwest of Sturgeon,
in Boone County. On the morning of the unfortunate
tragedy, Ryland and Palmer were unloading some corn
from a wagon into a box at a pond on Ryland's farm.
The pond was inclosed with hog-wire fence four feet
high. Palmer was in the wagon, while Ryland was in
the inclosure. They noticed Roberts' turkeys a short
distance from the pond, and saw two of the defendant's
sons apparently looking for them. Palmer testified, in
substance:

Ryland told me to go and tell them to tell their father
to keep the turkeys out until he got his hogs out. (Ry-
land was then feeding about a hundred hogs). I told
the boys, "Mr. Ryland says for you to tell your Pa to
try to keep the turkeys out till he can get the hogs out
of here." I helped drive the turkeys to their premises.
Soon after that Ryland saw Roberts coming from his
house, which was about forty rods from the pond. After

a few words of greeting, Roberts said to witness, "I don't want you to be chunking my turkeys." Palmer denied this, saying, "I merely threw a little club behind them to keep them going." Ryland said, "I don't think Charley has been chunking your turkeys," and Mr. Roberts said, "You are a liar." Ryland, who was in the inclosure, picked up a neck-yoke and threw it over the fence at Roberts, who started running away from the fence as soon as Ryland got the neck-yoke. It fell eight or ten feet behind Roberts, who went rapidly towards his house, saying, "I will be back in a few minutes." In a little while, Roberts returned carrying a shotgun. He walked to within twenty or twenty-five steps (or eight or ten steps, as defendant testified) of the deceased, saying, "Now, you s— of a b—, if you think you are a man, get your neck-yoke and I'll show you that I am a man." Ryland, still inside the fence, picked up an ax and said to defendant, "You are on my premises." To which defendant replied, "I know I am. I will show you I am a man." Ryland went to the fence, put one hand on a post and one foot on a wire, as if to get over the fence, when Roberts fired both barrels of the shotgun in quick succession, both shots taking effect in Ryland's breast, arms and legs. Roberts cramped his gun, threw out the shells and went off towards his house without saying a word. Ryland took a few steps, sat down and expired without uttering a word. Palmer went to Ryland's house and returned at once with Mrs. Ryland.

Reuben Barnes, the undertaker, testified that he found 115 shot wounds distributed over the front part of Ryland's body. There were four or five in the left leg above the knee, all running upward; three in the right hand which ranged upward. There were three or four wounds over the heart. Five or six shot had penetrated the arteries, out of which the embalming fluid ran when he put pressure on to force the fluid into the body. It was shown by Mrs. Ryland and others that Ryland and Roberts had always been on friendly terms.

The defendant testified that he had known deceased for thirty years, and had never had any trouble with him, and had seen him almost daily for several years. That at the time of this trouble, he owned a small flock of turkeys which had been feeding on deceased's premises and would get away from his children occasionally. He had received no word from deceased about the turkeys until the morning of this trouble. He had sent two of his small boys out a few minutes before to look after the turkeys, and in a short time they came back and told defendant they had seen deceased's farm hand (Charley Palmer) and he had told them to tell defendant that they did not want to catch the turkeys on that side of the fence any more. Defendant had seen deceased a day or two before and nothing was said about the turkeys at that time, so defendant decided to go and see Mr. Ryland, the deceased, himself, and went right up the ravine to where he was at the pond. Charley Palmer was also there at the time. They discussed the crops and the weather for a short time, when defendant asked Mr. Ryland if his turkeys had been bothering him much, to which he said they had been bothering him some. Defendant told him that he did not know about it as he had been working away from home, and that he had been advised by his boys that deceased had sent him word that the turkeys were bothering him, whereupon deceased stated that he did not send him any word, nor had he asked anybody to send him any word. Defendant then said to deceased that he had better stop Charley Palmer from meddling with his business, whereupon deceased stated that he had not been meddling with it, and called defendant a damned liar, said that Palmer had not been clubbing his damned old turkeys, and reached down and picked up a neck-yoke and started to strike defendant with it, when defendant jumped back, whereupon deceased threw the neck-yoke toward him and over his head; that when deceased picked up the neck-yoke he exclaimed, "I will kill you, G-d damn you." Deceased

said nothing else, and defendant started off up the hill to his house saying he would be back, and went to the house and got an old shotgun he had there and went back down to the pond. He stopped ten or twelve steps from deceased and said to him. "Now, Mr. Ryland, I want you to tell me what you want me to do about those turkeys; let's not have any more of that foolishness." Whereupon deceased picked up an ax and exclaimed, "I want to give you to understand you are on my land and you have got that gun and you use it and do it G-d damn quick or I will get you." Defendant then told deceased that he had aimed at him a minute ago with the neck-yoke, "and if you come at me with that ax, I will use this gun as sure as there is a God in heaven." Whereupon deceased made for the fence, and defendant brought the gun up, pulled back both hammers and fired both barrels. At this time deceased had one foot on the fence, the ax in his left hand, and his right hand on a post. Defendant discharged the barrels in rapid succession and fired to save his life. He then went home, put the gun down, rang up central and asked them to send a doctor out there. He then hooked up to his buggy, drove to Sturgeon and had his brother call the sheriff at Columbia, and told him he was ready to surrender.

The defendant had known deceased for twenty-five or thirty years, and had lived in the community with him for eight or ten years, and knew that deceased had a bad reputation for being a quarrelsome, turbulent, and dangerous man.

On cross-examination, the defendant testified that in the conversation with Ryland they both got mad; that Ryland threw the neck-yoke at him and that made him mad. "I started home mad—I went home and got my gun and went back down there, and I wanted to settle the trouble while it was new and before it got any older, without any further trouble if I could. We had always got along and I knew his disposition, and I thought it was better to settle it while it was new than to wait until

we met in the middle of the road and he would jump on me. "Q. After you got away from him and he made no attempt to pursue you, why didn't you say, 'Mr. Ryland, we have always been friends and neighbors and let's settle this without any feeling?' A. Well, I knew he was armed and I didn't propose to stand and take everything. I saw nothing that morning to indicate that he was armed, but I didn't know but what he was. . . . I went back with that gun with the intention of using it if I had to. . . . I knew that he was a dangerous and turbulent man. I didn't think there would be any shooting when I went back there. I took the gun to protect myself if I had to, but I didn't think we would have any further trouble. . . . I had seen this pistol of Ryland's several times. I had seen him with more than one. . . . My gun was an old one; it had hammers; one barrel was what they call half choke and the other was open. I loaded my gun while I was there in the house. . . . I knew Ryland usually had a pistol. Q. You went to the house to get your gun because you knew Ryland was a dangerous, turbulent man and if you went down there again there was liable to be some shooting? A. Well, I said I—I have answered it I thought a time or two. I have told you why I took the gun. I didn't know there would be any shooting; I didn't know there would not be any shooting. Q. But if there was any appearance of shooting, you wanted to be prepared to do your part. A. Well, I wanted to take care of myself, yes, sir. . . . I knew he had taken his gun to the road to shoot a fellow and there happened to be another man with him, and that was all, he told me, that kept him from shooting him. It was a friend of Mr. Ryland's with him."

It was shown by ten or twelve witnesses that the reputation of defendant in the community for being a peaceable, quiet, law-abiding citizen was good, and that the reputation of deceased as a quarrelsome, turbulent and dangerous man was bad.

In rebuttal, it was shown by many witnesses that the reputation of the deceased for peace and quiet was good.

Willard Goldsberry worked eight or nine years for the deceased on his farm; the last work he did was six or eight months before Ryland's death. Charles Kentzer worked for him eight or ten years; Andrew Kentzer for three or four years off and on; Virgil Goldsberry for about thirteen years. Neither of these ever saw or knew of Ryland carrying a pistol. Ryland did not have a weapon on his body at the time of his death.

The court gave eleven instructions for the State. The defendant objected to the first, fourth, fifth, sixth, eighth, ninth, tenth and eleventh.

The first relates to the weight and credibility of the testimony; it is in the usual form and is unobjectionable. The second is that the defendant is presumed to be innocent; that this presumption attends him throughout the trial and entitles him to acquittal unless the evidence as a whole satisfies the jury of his guilt beyond a reasonable doubt. The third is that such reasonable doubt, to authorize an acquittal, must be a substantial doubt of defendant's guilt, with a view of all the evidence, and not a mere possibility of his innocence. Fourth, that if the jury believe from the evidence that the defendant at, etc., on or about, etc., did wilfully, deliberately, premeditatedly and of his malice aforethought, with a loaded shotgun, shoot deceased, etc., you will find him guilty of murder in the first degree.

Instructions 5, 6, 7, 8 and 9, read:

"5. The court instructs the jury that he who wilfully (that is, intentionally) uses upon another, in some vital part, a deadly weapon, as a loaded shotgun, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act; but, if such deadly weapon is used without just cause or provo-

cation, he must be presumed to do it wickedly, or from a bad heart. If, therefore, the jury believe from the evidence that the defendant took the life of William Ryland by shooting him in a vital part with a shotgun, loaded with gunpowder and leaden ball, with a manifest design to use such weapon upon him and with sufficient time to deliberately and fully form the conscious purpose to kill and without sufficient reason or just provocation, then such killing is murder in the first degree; and while it devolves upon the State to prove the wilfullness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proven by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if the jury can satisfactorily and reasonably infer their existence from all the evidence, they will be warranted in finding the defendant guilty of murder in the first degree.

"6. The court instructs the jury that if you believe from the evidence that at the County of Boone and State of Missouri, on or about the 30th day of July, 1917, the defendant did wilfully, premeditatedly, and of his malice aforethought, but without deliberation, shoot William Ryland with a loaded shotgun, inflicting upon him a mortal wound, from which said mortal wound the said William Ryland then and there at the County of Boone and State of Missouri, died, then you will find him guilty of murder in the second degree and assess his punishment at imprisonment in the penitentiary for a term of not less than ten years."

Instruction 7 defines the terms "feloniously," "wilfully," "premeditatedly," "deliberately," "malice," and "malice aforethought."

"8. The court instructs the jury that the right of self-defense is a right not only conceded but guaranteed by law to every person. Therefore, you are instructed that if at the time defendant shot the deceased he had good reason to believe and did believe that the deceased

was about to immediately inflict upon him some great personal injury and he shot him for the purpose of averting such apprehended injury, then you must acquit him on the ground of self-defense, unless the jury find from the evidence that the defendant brought on or voluntarily entered into the difficulty for the purpose of killing Ryland or doing him some great bodily harm, and for the purpose and with the motive of wreaking his (the defendant's) vengeance, if any, upon said Ryland, and fired the fatal shots with such intent and purpose and not for the honest purpose of defending himself from attack. It is not necessary to this defense that the apprehended danger should have been real and about to fall. All that is necessary is that the defendant believed, and had good reason to believe, that such danger existed. On the other hand, it is not enough that the defendant believed in the existence of such danger, but he also must have reasonable cause for so believing before he can be acquitted on the ground of self-defense. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established in the case you cannot acquit defendant on the ground of self-defense even though you may believe defendant really thought his cause of apprehension reasonable.

"9. The court instructs the jury that if you believe from the evidence that the defendant provoked the difficulty or began the quarrel, with the purpose of taking advantage of deceased and taking his life, or of doing him some great bodily harm, then there is no self-defense in the case, however imminent the peril of the defendant may have become in consequence of an attack made upon him by the deceased; and if in such circumstances the jury believe that the defendant killed the deceased, then he is guilty of murder in the first degree and you should so find in your verdict.

"But, although the jury believe from the evidence that the defendant began the quarrel or provoked the dif-

ficulty with the deceased, yet if they also believe from the evidence that this was done by the defendant without any felonious purpose, that is, without any purpose to kill or to do him great bodily harm, and that thereupon the deceased was about to attack him, or if the defendant had good cause to believe and did believe that deceased was going to attack him with the ax and kill him, or do him some great bodily harm, and that defendant was compelled, in order to save his own life, or save himself from some great bodily harm, to take the life of deceased, still the law, while it will not entirely justify the killing on the ground of self-defense, will hold the defendant guilty of no higher crime than that of manslaughter in the fourth degree, and if you so find you will assess his punishment at imprisonment in the county jail for a term of not less than six months, or by a fine of not less than $500, or by both a fine of not less than $100 and imprisonment in the county jail not less than three months.''

Instruction 10 relates to the consideration to be given by the jury to the good character of the defendant, if proven to their reasonable satisfaction, in passing upon the question of the guilt or innocence of the defendant.

Instruction 11 relates to the consideration to be given to the evidence tending to prove that the reputation of the deceased as a quarrelsome, violent, turbulent and dangerous man was bad. These are in the usual form and not justly subject to criticism.

The court gave four instructions for the defendant. The first is that the defendant is not required to prove his innocence or that he was justified in the killing of the deceased on the ground of self-defense, but the State is required to prove beyond a reasonable doubt that the killing was without justification or excuse.

Number 2 is that the information is simply a charge or accusation, constitutes no evidence and raises no presumption or inference of guilt; that the presumption of innocence with which the law clothes the defendant is

not a matter of form which can be disregarded, but is a grave and substantial right which the jury must respect and observe.; that this legal right to be presumed innocent remains with the defendant throughout the trial and entitles him to an acquittal unless each and every element of the offense charged has been proved beyond a reasonable doubt.

Number 3 is that if one has a reasonable ground to believe that another intends to do him great bodily harm and that such design will be accomplished, he need not wait until his adversary gets advantage over him, but may immediately take such steps as appear to him necessary in his own defense.

Number 4, that in resisting an apprehended assault, one need not accurately gauge the force necessary to repel the assault; while the law requires that he shall not use unnecessary force, he may use such force as appears to him necessary under all the circumstances.

The defendant has not seen fit to favor us with a brief. We have, however, carefully read the record.

I. The first complaint is that the verdict is against the evidence and the weight of the evidence, and contrary to the law under the evidence. It is not contended that the verdict is not supported by substantial evidence.

The evidence, in our opinion, warranted the jury in finding the defendant guilty. The defendant testified that after the first altercation he started home mad, saying he would be back in a few minutes. He went to his house, a distance of forty rods. He was then out of danger and there was ample cooling time. He loaded his shotgun and returned. He testified that he knew Ryland was armed; that he didn't propose to stand and take everything. "I went back with my gun with the intention of using it if I had to." While Ryland was in the pond inclosure and before he advanced a step, Roberts addressed him in language that was equivalent to a challenge to mortal combat. In short, the jury was entirely justified in finding that the

**Sufficient Evidence.**

defendant returned to renew the unfortunate quarrel with the intention of taking Ryland's life.

II. On the first appeal, 280 Mo. 669, 681, 217 S. W. 988, after setting out the evidence on the first trial, WILLIAMS, J., said:

"We are of the opinion that appellant's own testi-mony in this case clearly shows that he was in the wrong in returning in the threatening, bluffing or menacing manner armed with a shotgun, to the scene of his recent difficulty, and from appellant's own testi-mony we think it conclusively appears that he thus intentionally provoked or brought about a renewal of the discussion or difficulty with deceased.

**Self-Defense.**

"If appellant did this with the felonious intention of causing deceased to renew the attack so that he (appellant) might have a pretext for killing him or doing him great bodily harm, then appellant was not entitled to invoke any phase of the right of self-defense. [State v. Partlow, 90 Mo. 608; State v. Darling, 202 Mo. 150, l. c. 172.] If, however, appellant wrongfully invoked or sought a renewal of the quarrel with the intention of merely overawing the deceased, or of holding him in check while a discussion could be had and a settlement or a mutual understanding reached as to their future status towards each other, or to accomplish any result other than the death or great bodily harm of the deceased, the appellant, while he would not be entitled to invoke the perfect right of self-defense, would, under the well established rule, we think, be entitled to invoke the right known as the imperfect right of self-defense, which would reduce the crime to manslaughter in the fourth degree. [State v. Gilmore, 95 Mo. 554; State v. Partlow, supra; Kelley's Criminal Law and Practice (3 Ed.) sec. 521, and cases therein cited.]

"From the State's evidence it would clearly appear that appellant provoked a renewal of the quarrel with felonious intent. If this were all the evidence there would be no evidence upon which to base an instruction

on any phase of the question of self-defense. This was
not all of the evidence, however. The appellant in ex-
plaining his intention in returning to the scene of the
trouble, said: 'I went down there to see if I could
settle the difficulty without any further trouble if I
could, because I wanted to settle it while it was new.
He and I had been good friends and I thought probably
I could do it in that way; and I took the gun along with
me to defend myself if I couldn't.'

"Upon this and other similar testimony in the rec-
ord we are of the opinion that appellant was entitled to
have the court instruct on the law of the imperfect right
of self-defense.

"The above instruction fails to properly instruct on
this phase of the law of self-defense and was, we think,
for that reason erroneous.

"We are of the opinion there is no evidence in this
case which will justify an instruction on the perfect right
of self-defense, and since this is true, that portion of the
instruction which deals with the perfect right of self-
defense is more favorable to appellant than the evidence
would warrant."

Goode, J., concurred in this opinion. J. T. Blair,
J., now Chief Justice, delivered a concurring opinion,
holding that there was evidence justifying an instruc-
tion on the law of imperfect self-defense, but dissenting
from the ruling that there was no substantial evidence
tending to prove appellant acted in the exercise of per-
fect self-defense. Woodson and Graves, JJ., concurred
in this opinion. Walker, J., delivered a dissenting opin-
ion, in which Williamson, J., concurred, holding that
the evidence did not warrant an instruction on man-
slaughter, and that the judgment should be affirmed.

III. We are of the opinion that the court correctly
declared the law in instructions 8 and 9, if the evidence
justified the giving of instructions on the law of self-
defense or imperfect self-defense. [State v. Starr, 38

Felonious Intent.
Mo. 270; State v. Partlow, 90 Mo. 608; State v. Hardy, 95 Mo. 455; State v. Gieseke, 209 Mo. 331 (6); State v. Sharp, 233 Mo. 269 (11); 21 Cyc. 807.] But on reading the defendant's cross-examination, it is clear that the defendant returned with the purpose of renewing the quarrel and the court should not have given an instruction on self-defense.

The defendant testified that he knew Ryland was armed, and then admitted he saw nothing to indicate that he was armed. "I thought it was better to settle it while it was new than to wait till we met in the middle of the road and he would jump on me." In other words, he had no reason to believe Ryland was armed that morning, and he concluded that he had an opportunity to meet him unarmed. We think his testimony, that he had no felonious intent when he returned and renewed the previous quarrel, when all the facts are considered, is unworthy of belief, and the instructions should not have been given.

IV. There is another consideration that is fatal to defendant's plea of self-defense. When the defendant went to his house and loaded his shotgun, he was forty rods from the scene of the quarrel and out of danger.

Avoiding Danger.
Concede that when he returned Ryland made a hostile demonstration with his ax. Ryland was on his own premises and, in effect, ordered the defendant off. There was a space of at least twenty-five feet and the four-foot fence between them. Roberts was not in imminent danger and should have withdrawn. If he could have avoided an assault by retreating, or if there was any other alternative, he was not justified in taking the life of his assailant.

In State v. Fraga, 199 Mo. 127, 134, BURGESS, P. J., said:

"In State v. Dettmer, 124 Mo. 426, SHERWOOD, J., in passing upon the right of the defendant to an instruction upon self-defense, held that he was not, saying, 'The right of that nature is not to be invoked unless all other means fail; it is the *dernier ressort*, and in

order to justify a homicide on the ground of self-defense, the doer of the homicidal act must have done everything in his power, consistent with his safety, to avoid the danger and to avert the necessity; and he must retreat, if retreat be practicable. [Kerr's Law of Hom., sec. 180, p. 203, and cases cited; State v. Gilmore, 95 Mo. 554.]'"

In State v. Johnson, 76 Mo. 121, 126, we said:

"The right of self-defense does not imply the right of attack, and it will not avail in any case where the difficulty is sought for and induced by the party himself —commenced or brought on by any wilful act of his toward his antagonist, or where he voluntarily and of his own free will enters into a difficulty. If the defendant was expecting a difficulty with the deceased, his right to defend himself did not arise until he had done everything in his power to avoid the necessity. If he could have safely avoided using the weapon he was not justifiable in taking the life of the deceased."

In 21 Cyc. 820, the general rule is succinctly stated:

"As a general rule in order to justify or excuse a homicide as in self-defense defendant must have embraced all reasonable or probable means of escape or retreat within his power and consistent with his safety, so as to avoid the danger and avert the necessity of killing, especially where he was at fault in getting himself into the dangerous situation. Thus as a general rule a person is not justified or excused in killing one who attacks him, unless he first retreats so far as he can do so without increasing his real or apparent peril; and the fact that retreat will not place him in less peril or on better vantage ground than before does not excuse him from performing this duty."

The defendant's testimony makes it clear that he was not in immediate danger and had ample opportunity to withdraw to his own premises without increasing his peril. [See Kelleys's Crim. Law, secs. 520 and 521, (3 Ed.)].

V.   The court's instruction numbered 1 for the defendant should not have been given as there was no self-defense in the case.   If the evidence had warranted an instruction on self-defense, it was too favorable for the defendant.   The burden is not on the State to prove that the killing was without justification.   It is upon the defendant to prove any affirmative matter in excuse, justification or extenuation of the offense, and he must show to the reasonable satisfaction of the jury that he acted in self-defense.   [Kelley's Crim. Law, sec. 253, (3 Ed.) and cases cited.]   So, also, the defendant's instruction numbered 3 was too favorable.   It is only when one has reasonable cause to apprehend immediate danger that he may act upon appearances.   [State v. Banks, 258 Mo. 479, 492; Kelley's Crim. Law, sec. 519, and cases cited.] The court should not have given the defendant's third and fourth instructions.   There was no error in the refusal of defendant's instructions A, B, C, D, E and F. Instruction F was on reasonable doubt and was covered by other instructions given.   The others were on self-defense.

VI.   It is contended that the court erred in giving instructions 4, 5 and 6 for the State, because they cover the entire case and ignore the defense set up by the defendant.   There would be no merit in this contention even if the evidence made a submissible case Omitting . of self-defense. The rule adopted by our Court Defenses. In Banc on this question is "where the plaintiff's instruction omits some feature which is not an element of his cause of action, but of the defense which is set up, the omission may be cured by instructions for defendant submitting that feature."   [State ex rel. Jenkins v. Trimble, 236 S. W. 651, 653, and cases cited.]

VII.   The appellant complains of the refusal of the court to permit him to testify to specific acts of violence on the part of the deceased towards others that were known to the defendant prior to the homicide, and to

conversations with deceased in which the latter told him
of trouble he had had with others. This
**Specific Lawlessness.** character of evidence was inadmissible to
prove that deceased was a lawless, turbulent
or dangerous man, as that could only be proven by wit-
nesses who knew his general reputation in the neighbor-
hood in which he lived. [State v. Phillips, 233 Mo. 299,
305; State v. Beaty, 25 Mo. App. 214; Seymour v. Far-
rell, 51 Mo. 95, 97; State v. Tabor, 95 Mo. 585, 590;
State v. Teeter, 239 Mo. 475, 485; Kelley's Crim. Law,
sec. 381; 16 C. J. 582.]

The rule is thus stated in 1 Greenleaf on Evidence
(16 Ed.) sec. 461b:

"One sort of evidence of character is conduct ex-
hibiting that character. How far may the witness's
character be exposed by introducing particular instances
of conduct throwing light on that character? The im-
portant line of distinction here is between proof by out-
side testimony—i. e., by other witnesses—and proof by
cross-examination of the witness to be impeached.

"It has long been settled that testimony from other
witnesses of particular instances of misconduct is an
improper mode of discrediting, because of the confusion
of issues and waste of time that would thus be involved,
and because of the unfair surprise to the witness, who
cannot know what variety of false charges may be speci-
fied and cannot be prepared to expose their falsity. This
rule excluding proof by other witnesses is well settled
and everywhere accepted."

VIII. The record fails to show a formal arraign-
ment or plea of guilty. The defendant announced that
he was ready and went to trial. This was equivalent to a
plea of not guilty and was a waiver of a formal arraign-
ment. [Sec. 3958, R. S. 1919; State v.
**Arraignment.** Braunschweig, 36 Mo. 397; State v. O'Kel-
ly, 258 Mo. 345, 372; State v. Allen, 267 Mo. 49, 183 S.
W. 329; State v. Hascall, 226 S. W. 18, 21.]

In his motion for new trial, appellant complains of other minor errors. We have examined them and find they are without merit.

The judgment is affirmed. All concur.